**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LANNY J. DAVIS & ASSOCIATES LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 11-1787 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 12, 14 |
| | : | | |
| REPUBLIC OF EQUATORIAL GUINEA, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT;
AND FINDING AS MOOT PLAINTIFF'S MOTION FOR A HEARING**

## I. INTRODUCTION

This action arises out of an alleged breach of contract for legal services between a law firm and a foreign sovereign nation. The foreign sovereign defendant was served with process but has not appeared in this litigation. Now before the Court are the plaintiff's motion for default judgment and motion for a status conference to conduct a hearing on damages. For the reasons described below, because the plaintiff has shown its entitlement to relief, the Court will grant the plaintiff's motion for default judgment and make a determination of damages. Because this opinion and accompanying order dispose of the case, the Court finds as moot the plaintiff's motion for a hearing.

## II. FACTUAL ALLEGATIONS AND BACKGROUND

On February 15, 2010, McDermott, Will & Emery LLP ("MWE") and the defendant, the Republic of Equatorial Guinea ("Equatorial Guinea"), entered into a contract for legal services (the "Engagement Agreement" or the "Agreement"). *See* Compl. Ex. A, ECF No. 1-1. H.E. Don

Alejandro Evuna Owono Asangano ("Don Alejandro"), the Minister of State and a senior advisor to President Teodoro Obiang Nguema Mbasogo, signed the Agreement on Equatorial Guinea's behalf.  *See id.* at 6; Davis Decl. ¶ 3, ECF No. 12-2.  Lanny J. Davis and Eileen M. O'Connor were the principal MWE attorneys responsible for performing the legal services under the Agreement.  *See* Compl. Ex. A, ECF No. 1-1.

The Engagement Agreement stipulated that between February 15, 2010, and January 31, 2011, MWE would perform "services" for the defendant, the details of which were defined by the "integrated" Memorandum of Understanding.  *See id.* § I.  In the December 24, 2009, Memorandum of Understanding, which "sets forth the understanding of the scope of services . . . that will govern the relationship between Davis–O'Connor/MWE and His Excellency President Obiang[,]" the services included advice and assistance in instituting a "comprehensive program of political, legal, and economic reform [the "Reform Program"], including, without limitation, the rule of law, democracy, an independent judiciary, and a free press."  Compl. Ex. B at 2, ECF No. 1-2.  MWE also agreed to "establish and implement an effective U.S. media and political communications plan" to advertise Equatorial Guinea in the United States and to "provide scheduling assistance and support" for the President and senior officials when they visited the United States.  *Id.* at 2–3.

In exchange for the services, Equatorial Guinea agreed to pay MWE $2,055,000 in four equal semi-annual installments of $513,750.00.  Compl. Ex. A § IV, ECF No. 1-1.  Payments were to be due on March 15, 2010; September 15, 2010; March 15, 2011; and September 15, 2011.  *See id.*; *see also* Davis Decl. ¶ 5, ECF No. 12-2.  Additionally, in a December 24, 2009, letter attached to the Memorandum of Understanding, MWE communicated its expectation that Equatorial Guinea would reimburse MWE for "ordinary and necessary out-of-pocket expenses,"

including transportation, lodging, and other incidental expenses, "without [Equatorial Guinea's] prior approval." Compl. Ex. A at 9, ECF No. 1-1; *see also* Davis Decl. ¶¶ 5–6, ECF No. 12-2. The same provision is also included in the Engagement Agreement itself. *See* Pl.'s Notice Filing Resp. Min. Order Ex. 1 § III, ECF No. 18-1 ("[T]he Presidency of the Republic will reimburse MWE for the ordinary expenses incurred by virtue of this Engagement Agreement without its prior approval . . . ."); *see also* Davis Decl. ¶ 6, ECF No. 12-2.

In April 2010, Mr. Davis left MWE and established Lanny J. Davis & Associates LLC ("LJDA"), the plaintiff in this action. *See id.* ¶ 7. After Mr. Davis left MWE, the firm verbally agreed to assign the Engagement Agreement and its payments to LJDA. *See id.* Additionally, Equatorial Guinea remitted its June 2011 payment to LJDA, an action that LJDA claims represents Equatorial Guinea's awareness of and consent to the assignment. *See id.*; Pl.'s Mot. Default J. Ex. D, ECF No. 12-4.

Beginning in March 2010, LJDA claims to have undertaken a "multiple-pronged effort" to implement and support the Reform Program. *See* Compl. ¶ 16, ECF No. 1. In particular, LJDA claims that it took steps to procure Equatorial Guinea's membership in the Energy Extractive Industries Transparency Initiative and assisted in drafting a public address delivered by President Obiang at the Global Media Forum in Cape Town, South Africa, on June 22, 2010. *See id.* Mr. Davis travelled to Africa on four occasions in May 2010, June 2010, July 2010, and November 2010, each trip allegedly undertaken "with the direction, knowledge, approval, and direct participation of senior representatives of the Government of Equatorial Guinea." *Id.* ¶ 12; *see also* Compl. Ex. E, ECF No. 1-5; Davis Decl. ¶ 8, ECF No. 12-2. On these trips, LJDA claims to have "worked closely" with the U.S. Ambassador to Equatorial Guinea and senior officials of the West Africa Bureau of the U.S. State Department to report on efforts to

implement the Reform Program.  *See* Compl. ¶ 15, ECF No. 1.  Additionally, in Washington,

D.C., Mr. Davis met with President Obiang, the Equatoguinean Ambassador to the United States,

the World Bank, oil company trade associations, and construction contractors that did business in

Equatorial Guinea.  *See* Davis Decl. ¶ 11, ECF No. 12-2.

Following difficulties in security payment, on February 3, 2011, the parties agreed to

terminate the Engagement Agreement.  *See id.* ¶ 12.  Equatorial Guinea had paid the March 15,

2010, installment of the Agreement to MWE in June 2010, *see* Compl. ¶ 13, ECF No. 1, and the

September 15, 2010 installment to LJDA in March 2011, *see id.* ¶ 18.  In mid-March 2011,

LJDA sent a table of the out-of-pocket expenses to Equatorial Guinea by mail and, on July 21,

2011, sent the table again by email.  *See* Pl.'s Mot. Default J. Ex. G, ECF No. 12-7.  On three

occasions, LJDA sent a notebook of the expenses, including receipts, to Don Alejandro.  *See id.*

Equatorial Guinea has paid for neither MWE's nor LJDA's out-of-pocket expenses, which LJDA

claims total $141,911.11.[1]  *See* Compl. ¶ 21 & Ex. E, ECF Nos. 1, 1-5.  LJDA has reimbursed

MWE for all Agreement-related costs and now claims to be the sole party entitled to enforce the

Agreement against Equatorial Guinea.  *See* Compl. ¶ 24.  On September 8, 2011, LJDA made its

"final written demand" to Equatorial Guinea.  *See* Davis Decl. ¶ 15, ECF No. 12-2.

LJDA filed this action on October 7, 2011.  On October 14, 2011, pursuant to the service

requirements of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(a)(3) (2006),

---

[1] The out-of-pocket expenses include $55,569.94 for trip charges; $6,799.10 for airfare for Ambassador Ondo; $474.33 for business meals; $13,405.56 for the National Day Party; $1,840.12 for translations; $2,101.70 for video, DVD, and cable; $162.05 for computer assisted research; $5,333.59 for telephone calls; $564.54 for local transportation; $8,438.04 for wireless roaming charges; $290.12 for business office telephone; $721.23 for wireless cellphones; $610.00 for filing and registration fees; $524.05 for photocopies; $18.00 for faxes; $268.35 for messengers and couriers; $33.96 for express mail; $38,757.06 for professional services and consultants; $3,722.15 for miscellaneous expenses, which include travel-related expenses such as parking and vaccinations; $2,177.50 for administrative support; and $129.72 for travel and business meals.  *See* Pl.'s Mot. Default J. Ex. G, ECF No. 12-7.

the Deputy Clerk of the Court mailed Equatorial Guinea one copy of the summons, complaint, and notice of suit with a Spanish translation of each.  *See* Certif. Mailing, ECF No. 4.  On January 6, 2012, LJDA received a signed return receipt for international mail, which was dated November 7, 2011.  *See* Notice Proof Serv., ECF No. 5.  Equatorial Guinea failed to file a response within sixty days of service, the statutory period under the FSIA.  *See* 28 U.S.C. § 1608(d) (2006).  On February 27, 2012, the Clerk entered default against Equatorial Guinea. *See* Default, ECF No. 8.  LJDA later filed a motion for default judgment and a motion for a status conference.  *See* Mot. Default J., ECF No. 12; Mot. Status Conf., ECF No. 14.  Although those motions have been pending for more than seven months, Equatorial Guinea has not responded to either motion, has not entered an appearance, and has otherwise failed to participate in this litigation.

## III.  ANALYSIS

### A.  Subject Matter Jurisdiction (Sovereign Immunity)

#### 1.  Legal Standard

Under the FSIA, "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 . . . ."  28 U.S.C. § 1604 (2006); *see also Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 839 (D.C. Cir. 2009) ("[F]oreign states generally are entitled to immunity unless the case falls within one of a list of statutory exceptions.").  Because Congress has "undisputed power to decide . . . whether and under what circumstances foreign nations should be amenable to suit in the United States[,]" *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983), the exceptions in sections 1605 to 1607 are "the sole basis" for obtaining subject matter

jurisdiction over a foreign state and "must be applied by the district courts in every action against

a foreign sovereign," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–

35 (1989) (quoting *Verlinden B.V.*, 461 U.S. at 493) (internal quotation marks omitted).

## 2.  Commercial Activity

LJDA contends that Equatorial Guinea is not immune from suit because of the FSIA's

"commercial activity" exception.  *See* Pl.'s Mem. P. & A. Supp. Mot. Default J. 9, ECF No. 12.

LJDA makes three arguments to support its position:  (1) that Equatorial Guinea itself carried on

commercial activities in the United States through the actions of Don Alejandro, who

participated in meetings, telephone conversations, and email discussions regarding the

Engagement Agreement; (2) that Mr. Davis conducted "virtually all of his work" in Washington,

D.C., in connection with commercial activities; and (3) that Equatorial Guinea carried on

commercial activities outside the United States that caused a direct effect in the United States.

*See id.* at 11–15.  Equatorial Guinea has not addressed the Court's jurisdiction, having failed to

participate in this case.

Courts have subject matter jurisdiction over suits arising from "commercial activity" that

is either (1) "based upon a commercial activity carried on in the United States by the foreign

state;" (2) "performed in the United States in connection with a commercial activity of the

foreign state elsewhere;" or (3) carried on "outside the territory of the United States in

connection with a commercial activity of the foreign state elsewhere and that . . . causes a direct

effect in the United States . . . ."  28 U.S.C. § 1605(a)(2) (2006).  "Commercial activity" is

defined as "either a regular course of commercial conduct or a particular commercial transaction

or act."  *Id.* § 1603(d).  "The commercial character of an activity shall be determined by

reference to the nature of the course of conduct or particular transaction or act, rather than by

reference to its purpose."  *Id.*  A contract for the provision of legal services constitutes

"commercial activity" under section 1605(a)(2).  *Embassy of the Fed. Republic of Nigeria v.*

*Ugwuonye*, 901 F. Supp. 2d 136, 141 (D.D.C. 2012) ("Contracts for legal services have been

found to constitute commercial activity when the claim against the foreign state arose from the

state's failure to pay legal fees. . . . In retaining Defendants' services for various legal

transactions and services in the United States, the Embassy engaged in commercial activity.  As

a result, the commercial activity exception to immunity under FSIA applies . . . ."); *Reichler,*

*Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1, 2 (D.D.C. 2007) (concluding that

Liberia's contracts for legal services constituted "commercial activity" under the FSIA).

   LJDA argues that the Engagement Agreement can be considered a commercial activity

that was "carried on in the United States."  To sustain jurisdiction on this basis, "something more

than a mere connection with, or relation to, commercial activity" must be shown.  *Saudi Arabia*

*v. Nelson*, 507 U.S. 349, 358 (1993); *see also NYSA–ILA Pension Trust Fund v. Garuda*

*Indonesia*, 7 F.3d 35, 38 (2d Cir. 1993) (requiring a "significant nexus" between the commercial

activity in this country and a plaintiff's cause of action).  The "action must be 'based upon' some

'commercial activity' by [the defendant] that had 'substantial contact' with the United States

within the meaning of the Act."  *Nelson*, 507 U.S. at 356.

   The Court concludes that this standard is easily met.  Mr. Davis has testified that "[o]ther

than the four trips [he] undertook to Africa, the majority of [his] work was performed here in

Washington, D.C."  Davis Decl. ¶ 11, ECF No. 12-2.  Mr. Davis testified that he met with the

Equatoguinean ambassador more than a dozen times in Washington D.C.; he also claims to have

conducted several meetings with other Equatoguinean officials, U.S. business leaders, NGOs, the

World Bank, and State Department staff in the United States.  *See id.*  The Court sees no reason

to doubt that these events and most of Mr. Davis's work did take place within Washington, D.C., especially in light of his office location here (both at MWE and later at LJDA). Because LJDA's action arises from commercial activity that was carried on in the United States, sovereign immunity does not apply.

Even if Equatorial Guinea's participation in the Engagement Agreement were not a commercial activity "carried on in the United States," subject matter jurisdiction would still exist because this action arises from commercial activity committed outside the U.S., but causing a "direct effect" here. *See* 28 U.S.C. § 1605(a)(2) (2006). "If the sovereign's activity is commercial in nature and has a direct effect in the United States, then the jurisdictional nexus is met, no immunity attaches, and a district court has the authority to adjudicate disputes based on that activity." *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994). Moreover, "a foreign sovereign's failure to make a contractually required deposit in a bank in the United States meets the statute's definition of a 'direct effect,' without regard to whether the parties considered the place of payment 'important,' 'critical,' or 'integral.'" *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1186 (D.C. Cir. 2003); *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619 (1992) ("Because New York was . . . the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming.").

Equatorial Guinea's payments under the Engagement Agreement were made in U.S. currency to banks in the United States. *See* Pl.'s Mot. Default J. Ex. D, ECF No. 12-4. Thus, even if it could be said that the relevant acts were committed outside the United States, Equatorial Guinea's failure to pay caused a "direct effect" here. *Reichler, Milton & Medel*, 484

F. Supp. 2d at 2 (noting that jurisdiction existed "because payment for the legal services was to be made to a banking institution in the United States" and "Liberia's failure to meet its payment obligation under this contract qualifies as an act that 'causes a direct effect in the United States' under the FSIA."). Thus, the Court concludes that the "commercial activity" exception applies, and that sovereign immunity poses no bar to LJDA's claim.

### B. Personal Jurisdiction

Once subject matter jurisdiction exists under the FSIA, personal jurisdiction over a foreign state defendant is established, provided that the defendant was properly served. *See* 28 U.S.C. § 1330(b) (2006) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."); *I.T. Consultants*, 351 F.3d at 1188; *see also Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) ("[U]nder the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." (internal quotation marks omitted)).[2] Here, service was initiated pursuant to 28 U.S.C. § 1608(a)(3) on October 14, 2011, *see* Certif. Mailing, ECF No. 4, and a signed return receipt indicates that service was effected upon Equatorial Guinea on November 7, 2011, *see* Notice Proof Serv., ECF No. 5. Accordingly, the Court is satisfied that it has personal jurisdiction over Equatorial Guinea in this matter.

---

[2] The court need not determine whether the defendant had "minimum contacts" with this forum. That analysis is normally undertaken to ascertain whether a court's assertion of personal jurisdiction would comport with the Due Process Clause. *I.T. Consultants v. Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 70–71 (D.D.C. 2010). But "foreign states are not 'persons' protected by the Fifth Amendment." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). Thus, "as a constitutional matter, there is no constitutional matter." *I.T. Consultants*, 351 F.3d at 1191.

### C.  Default Judgment

Having determined that it has subject matter jurisdiction over this case and personal jurisdiction over Equatorial Guinea, the Court now turns to the merits of LJDA's motion for default judgment.  Because the Court is able to resolve the motion based on the documentary evidence submitted with LJDA's briefing, LJDA's motion for a status conference to determine damages is moot.

#### 1.  Legal Standard

To obtain a default judgment under Federal Rule of Civil Procedure 55, a plaintiff must undertake two steps.  First, the plaintiff should request that the Clerk of the Court enter a default against the party who has "failed to plead or otherwise defend" against an action.  Fed. R. Civ. P. 55(a).  LJDA complied with this step on February 27, 2012, and the Clerk entered default on that same day.  *See* Aff. Default, ECF No. 7; Default, ECF No. 8.  Once default has been entered, the plaintiff may move for default judgment.  *See* Fed. R. Civ. P. 55(b).

A court may not enter default judgment against a foreign state under the FSIA "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e) (2006).  "This requirement 'imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default.'"  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 28 (D.D.C. 2012) (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)).  In evaluating whether a plaintiff has sufficiently established its claim, courts may accept the plaintiff's uncontroverted factual allegations if they are supported by documentary and affidavit evidence.  *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012); *see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C.

2009) ("In default judgment cases, plaintiffs may present such evidence in the form of affidavits or declarations rather than through live witnesses testifying in open court.").

## 2.  Breach of Contract

"The FSIA is purely jurisdictional in nature, and creates no cause of action." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 1582 (2013).  So, once the Court determines that jurisdiction exists, it must determine whether a cause of action is available—for example, under state law.  *Oveissi*, 573 F.3d at 840.  Here, LJDA brings a suit for breach of contract and quantum meruit and, for purposes of its default judgment motion, elects breach of contract as the basis for damages.  *See* Pl.'s Resp. Ct. Order 3–4, ECF No. 17.[3]

### a.  Choice of Law

Before reaching the substance of LJDA's breach of contract claim, the Court must first determine whether D.C. or Equatoguinean law applies.[4]  Neither the Engagement Agreement nor the FSIA contains an express choice-of-law provision.  In FSIA cases, the forum state's choice-of-law rules apply.  *See Oveissi*, 573 F.3d at 841.  District of Columbia courts apply "a constructive blending" of a "governmental interest analysis" with a "most significant relationship" test.  *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989).  In

---

[3] LJDA requests that the Court not dismiss the quantum meruit claim, however, asserting that "[i]t is conceivable this claim may yet become an issue were the defendant to challenge . . . the contractual debt itself."  Pl.'s Resp. Ct. Order 3–4, ECF No. 17.  Therefore, the Court will apply a breach of contract analysis without prejudice to LJDA's right to raise an alternative quantum meruit claim should Equatorial Guinea challenge the contractual debt.  *See also N. Am. Graphite Corp. v. Allan*, 184 F.2d 387, 389–90 (D.C. Cir. 1950).

[4] Because neither LJDA nor the Court is well-versed in the nuances of Equatoguinean contract law, the Court will, at LJDA's recommendation, *see* Pl.'s Resp. Ct. Order 4–5, ECF No. 17, assume that there is a conflict between D.C. and Equatoguinean contract law triggering a choice-of-law analysis.  *See also Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985) ("Under District of Columbia principles, we must first determine whether there is a conflict between the laws of the relevant jurisdictions.").

applying this blended analysis to breach of contract disputes in which the contract lacks an effective choice-of-law provision, D.C. courts apply the five factors outlined in the Restatement: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance of the contract, (4) the location of the subject matter of the contract[,] and (5) the place of incorporation and the place of business of the parties." *Kroger v. Legalbill.com*, 436 F. Supp. 2d 97, 104 (D.D.C. 2006) (collecting cases); *see also* Restatement (Second) of Conflict of Laws § 188(2) (1971).

Although MWE and Equatorial Guinea each signed the Engagement Agreement in their own locations (Washington, D.C., and Equatorial Guinea, respectively), the contract was both drafted and translated into Spanish in D.C.  *See* 2d Davis Decl. ¶ 4, ECF No. 17-1.  Following an initial meeting between Mr. Davis and President Obiang in New York, the contract negotiations took place via email from the parties' respective locations in Washington, D.C., and Equatorial Guinea.  *See id.*  The vast majority of LJDA's performance under the Agreement occurred in Washington, D.C., including Mr. Davis's work devising media and political communication strategies and his meetings with Equatorial Guinea's ambassador, U.S. State Department staff, the World Bank, and various NGOs.  *See id.* ¶ 7.  Mr. Davis's place of business, both at MWE and at LJDA, was in Washington, D.C., while Equatorial Guinea worked from both its home territory and its embassy in Washington, D.C.  *See id.*  On balance, each factor favors the application of D.C. contract law, though the "place of negotiation" factor is, at worst, neutral. Therefore, the Court will apply D.C. contract law to this dispute.

### b. Prima Facie Case and Determination of Damages

"For a plaintiff to prevail in a FSIA default proceeding, the plaintiff must present a legally sufficient prima facie case, i.e., 'a legally sufficient evidentiary basis for a reasonable jury

to find for plaintiff.'"  *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008)

(italics omitted) (quoting *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C.

2002)), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011).   Here, LJDA brings suit for breach of contract under

D.C. law.  Such a claim includes four elements:   "(1) a valid contract between the parties; (2) an

obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused

by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

　　　LJDA has submitted to the Court a copy of the signed Engagement Agreement as

originally executed in Spanish, and has also provided a certified English translation.  *See* Compl.

Ex. A, ECF No. 1-1 (Spanish); Pl.'s Notice Filing Resp. Min. Order Ex. 1, ECF No. 18-1

(English).  The face of the document—containing signatures and terms specifying performance

of services in exchange for cash payment—indicates that the necessary contract formation

elements of offer, acceptance, and consideration are met.  *See Bullard v. Curry-Cloonan*, 367

A.2d 127, 131 (D.C. 1976).  The Court further finds that the Agreement constitutes a valid

contract as between LJDA and Equatorial Guinea based on Mr. Davis's testimony that MWE

verbally assigned the Agreement to LJDA, *see* Davis Decl. ¶ 7, ECF No. 12-2, and Equatorial

Guinea's acquiescence to that assignment as evidenced by its direct payments to LJDA, *see* Pl.'s

Mot. Default J. Ex. D, ECF No. 12-4.  *See also Flack v. Laster*, 417 A.2d 393, 399 (D.C. 1980)

("The effectiveness of an assignment does not normally depend upon the consent of the obligor

unless the rights to be assigned involve the performance of unique services.").

　　　Under the plain language of the Agreement, Equatorial Guinea had a duty to "reimburse

MWE for the ordinary expenses incurred by virtue of th[e] Engagement Agreement" and "pay, in

advance, for transportation, hotel, and other incidental expenses related to MWE's visits to

Equatorial Guinea" in its performance of the Agreement.  Pl.'s Notice Filing Resp. Min. Order

Ex. 1 § III, ECF No. 18-1; *see also Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) ("When interpreting a contract . . . we examine the document on its face, giving the language used its plain meaning." (internal quotation marks omitted)).   LJDA provided the Court with a copy of the invoice Mr. Davis sent to Equatorial Guinea, accounting for $141,941.11 in travel and other ordinary expenses.  *See* Pl.'s Mot. Default J. Ex. G, ECF No. 12-7.  Mr. Davis provided sworn testimony that LJDA never received reimbursement for the outstanding expenses, showing that Equatorial Guinea breached its duty and damaged LJDA as a result.  *See* Davis Decl. ¶ 15, ECF No. 12-2.  Having reviewed the Engagement Agreement, the invoice, and Mr. Davis's testimony, the Court is satisfied that LJDA has put forth a prima facie case establishing its right to relief. *See* 28 U.S.C. § 1608(e) (2006); *Gates*, 580 F. Supp. 2d at 63.

Courts are not required to hold an evidentiary hearing before determining the amount of damages.  *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).  In FSIA default judgment proceedings, the plaintiff may establish proof by affidavit.  *See Oveissi*, 879 F. Supp. 2d at 49.  "Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true."  *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006).  Here, LJDA has provided both affidavit and documentary evidence of its unreimbursed out-of-pocket expenses.  The 35-page invoice, dated March 15, 2011, provides a line-by-line itemization of LJDA's expenses, totaling $141,941.11, a significant share of which was incurred during Mr. Davis's four trips to Africa.  *See generally* Pl.'s Mot. Default J. Ex. G, ECF No. 12-7.  The Court has reviewed the invoice and verified that the total is mathematically accurate.  The invoice is attached to a cover letter to President Obiang, which states that LJDA provided "fully-receipted evidence of the[] expenditures" to Don Alejandro on three previous occasions.  *See id.*  The Court has also reviewed the individual line items on the invoice and

finds that they constitute "ordinary expenses incurred" in a typical engagement for legal services, as required by the Agreement—expenses such as travel, translations, communications services, and the like. *See* Pl.'s Notice Filing Resp. Min. Order Ex. 1 § III, ECF No. 18-1; *see generally* Pl.'s Mot. Default J. Ex. G, ECF No. 12-7; *supra* note 1 (detailing expense category subtotals). The Court will therefore grant default judgment on LJDA's breach of contract claim and award LJDA the requested $141,941.11 in damages for Equatorial Guinea's breach of the Engagement Agreement.

### D.  Interest, Attorneys' Fees, and Costs

LJDA's motion for default judgment also seeks pre- and post-judgment interest, attorneys' fees, and costs. *See* Pl.'s Mem. P. & A. Supp. Mot. Default J. 17, ECF No. 12.

A foreign sovereign is not immune from an award of pre-judgment interest if an FSIA exception applies to the underlying claim. *See, e.g.*, *Ben-Rafael*, 540 F. Supp. 2d at 59; *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 264–65 (D.D.C. 2008). Because pre-judgment interest is a component of a plaintiff's compensation for a breach of contract claim, D.C. law applies. *See* D.C. Code § 15-109 (2001); *Oveissi*, 573 F.3d at 841 (choice of law); *see also* 28 U.S.C. § 1606 (2006) ("[T]he foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ."). Under D.C. law, "[i]n an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only." D.C. Code § 15-109 (2001).[5] However, the statute "does not preclude . . . the court . . . from including

_____

[5] D.C. law also states that interest on "a liquidated debt on which interest is payable by contract or by law or usage [shall be awarded] from the time when it was due and payable . . . ." D.C. Code § 15-108 (2001).  However, that provision is inapplicable to Equatorial Guinea's breach of the Engagement Agreement because the Agreement does not provide a contractual

interest as an element in the damages awarded [i.e., pre-judgment interest], if necessary to fully

compensate the plaintiff." *Id.*  A trial court has wide discretion in awarding pre-judgment

interest.  *See Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 n.6 (D.C. 1981); *Noel v.

O'Brien*, 270 A.2d 350, 351 (D.C. 1970).  "Relevant considerations include whether the plaintiff

has been deprived of the use of the money withheld, whether he timely commenced suit, and the

certainty of the amount due."  *See Winder v. District of Columbia*, 555 F. Supp. 2d 103, 111

(D.D.C. 2008), *aff'd sub nom. Winder v. Erste*, 566 F.3d 209 (D.C. Cir. 2009).  Because LJDA

seeks reimbursement for expenses already incurred, it has been deprived of the money withheld

by Equatorial Guinea.  The Court also finds that LJDA timely commenced suit, having filed its

complaint one month after it sent its final payment demand to Equatorial Guinea.  Finally, the

Court is satisfied that LJDA's detailed, 35-page invoice described the amount due with sufficient

certainty.  Because the Engagement Agreement sets deadlines only for the scheduled fee

payments and not expense reimbursements, the Court finds it equitable to award pre-judgment

interest on the award of $141,941.11 as of September 8, 2011, the date of LJDA's final demand

for payment.  *See Davis Decl.* ¶ 15, ECF No. 12-2.  In the absence of an express interest rate set

by contract, the D.C. Code specifies a rate of 6 percent per annum.  *See D.C. Code § 28-3302(a)

(2001); *District of Columbia v. Pierce Assocs., Inc.*, 527 A.2d 306, 310 (D.C. 1987).  This

amounts to $16,750.94 in simple interest.[6]

Post-judgment interest is governed by federal law, even in a case in which a federal court

hears only state-law claims.  *See Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 115 (2d Cir.

2013).  Post-judgment interest may be awarded against a foreign sovereign where the court has

entitlement to interest.  *See Steuart Inv. Co. v. Meyer Grp., Ltd.*, 61 A.3d 1227, 1240–41 (D.C.
2013).

[6] On a principal of $141,941.11 at 6 percent annually, the daily interest is $23.33.  It has
been 718 days since LJDA made its final demand for payment.

jurisdiction under the FSIA.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d, 261, 324 (D.D.C. 2005).  Federal statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment . . . ."  28 U.S.C. § 1961(a) (2006).  Application of section 1961(a) is mandatory, not discretionary.  *See Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012).  The Court will therefore award post-judgment interest at the statutory rate.

LJDA also seeks attorneys' fees and costs, but does not brief these issues or provide any estimate of the fees and costs sought.  *See* Pl.'s Mem. P. & A. Supp. Mot. Default J. 17, ECF No. 12.  Because the Court cannot make a ruling on attorneys' fees where LJDA has not provided an estimate or set forth legal grounds for an award of fees, the Court will deny the request without prejudice.  LJDA may file a post-judgment motion for attorneys' fees in accordance with Federal Rule of Civil Procedure 54(d)(2)(B).  Similarly, although costs are awarded to a prevailing party as a matter of course, *see* Fed. R. Civ. P. 54(d)(1), LJDA has not submitted an estimate of costs.  LJDA may seek costs in accordance with Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54.1, but the Court will not make an award of costs at this time.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant LJDA's motion for default judgment and award to LJDA $141,941.11 for unreimbursed out-of-pocket expenses under the Engagement Agreement, plus pre-judgment interest in the amount of $16,750.94, for a total judgment of $158,692.05.  The Court will also grant LJDA's request for post-judgment interest, deny without prejudice LJDA's request for attorneys' fees, deny without prejudice LJDA's request for costs,

and deny as moot LJDA's motion for a hearing.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.


Dated:   <u>August 26, 2013</u>                              <u>      */s/ Rudolph Contreras*      </u>
                                                        RUDOLPH CONTRERAS
                                                        United States District Judge